UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA                 :

          -v.-                           :     S3 03 Cr. 1188 (RMB)

DIEGO FERNANDO MURILLO-BEJARANO,         :
     a/k/a, "Don Berna,"
     a/k/a, "Adolfo Paz."                :

                    Defendant.           :
- - - - - - - - - - - - - - - - - - - - x


<u>GOVERNMENT'S SENTENCING MEMORANDUM</u>




                              LEV L. DASSIN
                              Acting United States Attorney
                              Southern District of New York
                              Attorney for the United
                              States of America.




ERIC SNYDER
GURUANJAN SAHNI
Assistant United States Attorneys
     - Of Counsel -

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA                    :

     -v.-                                      :     **S3 03 Cr. 1188 (RMB)**

Diego Fernando Murillo-Bejarano,            :
        a/k/a "Don Berna,"
        a/k/a "Adolfo Paz,"                  :

                  **Defendant.**      :
- - - - - - - - - - - - - - - - - - - - - x


## GOVERNMENT'S SENTENCING MEMORANDUM

       The Government respectfully submits this memorandum in connection with the sentencing of defendant Diego Fernando Murillo-Bejarano ("Murillo" or "the defendant"), scheduled for February 24, 2009, at 12:45 p.m.  The Government respectfully requests that Murillo be sentenced to 405 months' imprisonment, which is at the top of the applicable United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") range of 324-405 months' imprisonment as calculated by the United States Probation Office.  This Guidelines range is also the agreed-upon sentencing range contained in the plea agreement between the parties.

       As set forth in greater detail below, the Government seeks a sentence at the top of the Guideline range primarily on account of the enormous quantity of cocaine that Murillo

2

imported into the United States (which included numerous metric tons), as well as his leadership position within the *Autodefensas Unidas De Colombia* ("AUC"), a terrorist and paramilitary organization in Colombia.

### Factual Background

As alleged in the Indictment and described in the PSR, the defendant was the *de facto* leader of the AUC, a paramilitary organization based in Colombia that has been engaged in warfare with the *Fuerzas Armadas Revolucionarias de Colombia*, ("FARC"). The AUC has been designated by the United States Department of State as a foreign terrorist organization.  (PSR ¶ 9).  To support its paramilitary activities and to enrich its leaders, including Murillo, the AUC was involved in narcotics trafficking on a massive scale, and was responsible for the importation of many multi-ton shipments of cocaine into the United States. (*Id.* ¶ 9, 11).  Among other things, the AUC oversaw the transportation of cocaine by sea -- on board speedboats and cargo vessels -- from Colombia to the United States, either directly or through third countries like Mexico, the Dominican Republic, and Venezuela.  (*Id.*).  During the period when Murillo was one of the principal leaders of the AUC, the organization's force was comprised of thousands of armed paramilitaries.

Although Murillo officially held the title of

Inspector General of the AUC, he was the *de facto* leader of the organization, and is described by witnesses as the person who was in charge of narcotics-trafficking activities for the organization, including much of its cocaine transportation and financial operations. (PSR ¶ 10). Murillo acquired, and then maintained, his power in the AUC in part from the proceeds of his extensive drug-trafficking activities. (*Id.*).

The cocaine shipped to the United States by the AUC generated millions of dollars in New York and other U.S. cities. (PSR ¶ 11). At the direction of individuals working under the supervision of Murillo's organization, these sums were placed in bags or suitcases and exchanged at pre-arranged locations. The purpose of these transfers was to allow the conspiracy to repatriate narcotics proceeds to Colombia. (*Id.*).

On May 27, 2005, Colombian authorities, pursuant to a request for a provisional arrest from the United States, arrested Murillo in Colombia. (PSR ¶ 22). Thereafter, the United States filed an extradition request with the Colombian Government. As part of its extradition request, the United States provided assurances to the Government of Colombia that it would not seek a life sentence for the defendant, but instead would ask for a prison term of years. (*Id.* ¶ 22). On May 13, 2008, Colombian authorities extradited the defendant to the

4

United States.  (*Id.* at 1).

## **Procedural Background**

### 1.   **The Plea Proceeding**

On June 17, 2008, the defendant entered a guilty plea to Count One of the Indictment pursuant to a plea agreement with the Government.  Count One charged the defendant with conspiracy to:  (1) import into the United States five kilograms and more of cocaine; and (2) distribute five kilograms and more of cocaine knowing and intending that the cocaine would be unlawfully imported into the United States, all in violation of Title 21, United States Code, Section 963.

Both the plea agreement and the Presentence Report prepared by the Probation Office calculated the applicable sentencing Guideline range for the offense as 324-405 months' imprisonment.  *See* Plea Agreement at 3; PSR ¶¶ 5(i), 66.  This Guideline range was computed as follows: a base offense level of 38, pursuant to U.S.S.G. § 2D1.1(c)(1); a two-level increase because a firearm was possessed in connection with the offense, pursuant to U.S.S.G. § 2D1.1(b)(1); a four-level increase because the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, pursuant to U.S.S.G. § 3B1.1(a); and a three-level reduction based on the defendant's acceptance of

responsibility and timely entry of a guilty plea, pursuant to
U.S.S.G. § 3E1.1(a) and (b).  (Plea Agreement at 2).  The
defendant is in Criminal History Category I.  *Id.*  Accordingly,
with an applicable Guidelines offense level of 41, the
Stipulated Guidelines range is 324 to 405 months' imprisonment.
*Id.* at 3.

　　　　The plea agreement also contains a stipulation that
the charged conspiracy involved the importation of "numerous
metric tons of cocaine" into the United States.  (Plea Agreement
at 2). The parties also stipulate in the Agreement that a
sentence within the range of 324 to 405 months' imprisonment
"would constitute a reasonable sentence in light of all of the
factors set forth in Title 18, United States Code, Section
3553(a)," and that "neither party will seek a sentence outside
of" this range or "suggest that the Court *sua sponte* consider a
sentence outside of" this range.  (Plea Agreement at 3).

　　　　At his guilty plea, Murillo allocuted that he
conspired through the AUC, which he described as a "military,
political and anti-communist" organization, to tax shipments of
cocaine destined for the United States.  (Plea Tr. 25; *see also*
PSR ¶ 25).  Murillo affirmed that it was his intention that the
cocaine be imported into the United States.  (*Id.* at 26).

2.    **The Presentence Report**

The final Presentence Report ("PSR") prepared by United States Probation ("Probation") calculated the Stipulated Guideline range of 324 to 405 months using the same computations used in the plea agreement.  (PSR ¶¶ 26-36, 41, 66.)  Based on its findings, the Probation Office recommended a sentence of 364 months' imprisonment, followed by five years of supervised release.  (PSR at 18-19.)  Furthermore, the Probation Office recommended a fine of $4,000,000, in addition to the mandatory special assessment of $100 that must be imposed at the time of the sentence.  (*Id.*)

By letter dated February 2, 2009 ("Defense Letter"), Murillo agreed with the offense level computation in the PSR. Specifically, Murillo agreed that the Probation Office properly calculated his total Offense Level as 41, and that based upon that offense level, the Guideline range of 324 to 405 months' imprisonment is appropriate.  (*See* Defense Letter at 7-8). Murillo, however, requests that the Court impose a sentence of 324 months' imprisonment -- the lowest end of the Stipulated Guideline range. He argues that the lowest sentence within that range is appropriate due to "the conditions of his three (3) year period of incarceration in Colombia" and "the unique facts and circumstances surrounding this crime . . . ."  *Id.* at 15,

7

18.  For the reasons set forth below, the Court should reject Murillo's request and impose a sentence of 405 months' imprisonment.

## Discussion

I.   **The Court Should Sentence Murillo At The Top Of The Applicable Guidelines Range**

   A. **As A Leader Of The AUC, Murillo Used The Organization To Further His Drug Trafficking Activities**

        The Government has conferred with a number of witnesses regarding Murillo's substantial history of drug trafficking and leadership within the AUC.  Set forth below is a partial summary of the information that the Government has obtained from some of its key witnesses.

        In or about April 2000, CW-1 approached Murillo and solicited his assistance in collecting a multi-million dollar drug debt that CW-1 was owed by other Colombian narcotics traffickers. (PSR ¶ 12).  Murillo agreed to collect this debt for CW-1, in exchange for CW-1 agreeing to transport cocaine for Murillo.  (*Id.*).  CW-1 understood that Murillo was one of the highest-ranking leaders of the AUC.  (*Id.*).  Based on their agreement, CW-1 transported 700 kilograms of Murillo's cocaine from Colombia to New York City, and thereafter assisted in remitting millions of dollars of drug proceeds back to Colombia on Murillo's behalf.  (*Id.* ¶ 13).  After this initial shipment,

8

between 2000 and 2002, CW-2 coordinated, again on Murillo's behalf, the transportation of four additional loads of cocaine, totaling over 5,000 kilograms, from Colombia to New York City. (*Id.*).  Subsequently, CW-1 continued to arrange shipments of cocaine for Murillo to the United States, totaling thousands of kilograms.  (*Id.* ¶¶ 14-16).

In or about May 2002, a second individual (CW-2) arranged to have two shipments of narcotics proceeds picked up in New York City and remitted to Murillo in Colombia.  (PSR ¶¶ 17-18).  The narcotics proceeds totaled in excess of $200,000. (*Id.*).

A third witness (CW-3) was a close advisor to the former head of the AUC, Carlos Castano.  (PSR ¶ 19).  CW-3 learned, by attending meetings with top AUC leaders (including Castano and Murillo), that Murillo served as the AUC's principal liaison to the Norte Valle Cartel ("NVC"), one of the largest cocaine cartels in Colombia.  (*Id.*).  CW-3 explained that Murillo and the AUC charged the cocaine cartels a substantial fee for every cocaine shipment that passed through AUC-controlled territory within Colombia, and that Murillo retained many of the proceeds that he had extracted from drug traffickers, including the NVC.  (*Id.*).

A fourth witness (CW-4), who was involved in shipping

9

a 200 kilogram load of cocaine to the United States, owed a debt to the owners of that cocaine after it was seized in Texas.  CW-4 was subsequently kidnapped in Medellin, Colombia in 1998 and was held by people who worked for Murillo until he could pay the debt.  CW-4 was ultimately able to pay this narcotics debt and subsequently had a discussion with Murillo about working together on future narcotics transactions.[1]  (PSR ¶ 20).

## B. Murillo's Incarceration In Colombia Does Not Merit A Reduction In Sentence

First, Murillo asks this Court to reduce his sentence in order to credit him for the three-year period of incarceration in Colombia pending extradition to the United States.  Next, Murillo argues that the conditions of his confinement in Colombia warrant a reduction of his sentence to the low end of the applicable Guidelines range. (Defense Letter at 15 and 16).  The Government opposes both of these requests.

### 1. Any credit for Murillo's time served in Colombia is properly within the discretion of the Bureau of Prisons

It is the Government's position that the Court is authorized only to make a recommendation to the Bureau of Prisons ("BOP"), and not to order credit for the time Murillo

---

[1]    The information received from CW-4 was not accurately described in the PSR.  (PSR ¶¶ 20-21).  This paragraph more accurately reflects the interaction that CW-4 had with Murillo.

spent incarcerated in Colombia.

The statutory authority for the defendant to receive
any credit for time spent in jail in Colombia awaiting
extradition appears in 18 U.S.C. 3585(b), which reads, in
relevant part:

> (b) Credit for prior custody - A defendant shall
> be given credit toward the service of a term of
> imprisonment for any time he has spent in
> official detention prior to the date the
> sentence commences -
>> (1) as a result of the offense for which
>> the sentence was imposed. . . .that has
>> not been credited against another
>> sentence.

The District Court does not have the authority to credit this
period to the defendant; rather, any adjustment to the sentence
for time in Colombia rests in the control of the BOP. *See
United States* v. *Wilson*, 503 U.S. 329, 334, 112 S. Ct. 1351
(1992) (holding that under 18 U.S.C. § 3585(b), the Attorney
General, not the district court, is authorized to compute the
credit an inmate should receive for a prior period of
incarceration); *Werber v. United States*, 149 F.3d 172, 179 (2d
Cir. 1998) ("[O]nly the BOP is entitled to give credit for time
served prior to the commencement of a sentence."). Similarly,
it is also within the BOP's exclusive responsibility to credit
the defendant for time he has served in a prior custodial
facility, and this should not be calculated in the Court's

11

imposition of sentence.  Indeed, it would be error for the District Court to give such credit.  *United States v. Los Santos*, 283 F.3d 422, 427 (2d Cir. 2002)(district court abused its discretion by departing in order to credit Los Santos with the time from his transfer to federal custody on March 21, 2000 to the date of sentencing eight months later).

Accordingly, the District Court should not credit any time against the sentence it imposes on the defendant, but of course may make any recommendations to the BOP that it deems appropriate.  In this case, there are open questions as to whether Murillo was incarcerated in Colombia solely because of the United States' extradition request, or also because of domestic charges that were pending against him in Colombia.  The answer to these questions may affect the amount of credit that Murillo receives from the BOP.

> **2.   A sentence reduction based on the conditions of Murillo's confinement in Colombia is not warranted.**

Murillo also seeks consideration at sentencing based on the following conditions of his confinement at Combita, Itagui, and La Picota prisons in Colombia: (1) solitary confinement in a windowless cell, and limited family visits during his two years of confinement at Itagui prison; (2) freezing temperatures, "concrete slab beds," "sparse, mildewed,

and soiled blankets," limited food, unsanitary dining
conditions, and a generally violent atmosphere during the six
months of confinement at Combita Prison; and (3) cold
temperatures, no mattress and cold bath water during his
"several day" period of incarceration at La Picota prison.  (*See*
Defense Letter at 15-16).

As an initial matter, the Government believes that the
defendant's factual allegations regarding the conditions at
Combita are not accurate.  Government representatives have
conferred with Special Agent Caesar Medina of the United States
Drug Enforcement Administration, who was stationed at the DEA's
Bogota Country Office from in or about 2003 until in or about
2008.  During his time at the Bogota Country Office, Special
Agent Medina had traveled to Combita on approximately 5 to 6
occasions between 2004 and 2007.  In addition, Special Agent
Medina, prior to becoming a DEA agent, held various positions
with the BOP between 1994 and 1998.

According to Special Agent Medina, Combita was built
through consultation with BOP personnel, and appeared
structurally similar to many BOP facilities.  During Special
Agent Medina's visits to Combita, which often involved
transferring one or more inmates at a time for purposes of
extradition, he frequently observed inmates mopping the floors

13

and performing other cleaning tasks.  Special Agent Medina noted
that the facility appeared clean.  Special Agent Medina also
observed that the inmates he transferred appeared healthy, not
malnourished, and some had even commented that they "put on
weight" while at Combita.  Special Agent Medina noted that much
of Combita is covered, as it must be, since it is a maximum
security facility, and he noted that over the course of the
three years he had visited Combita (2004 to 2007), the
conditions and cleanliness of the facility improved.

          The Government submits that much of what the defendant
describes as the "deplorable conditions he experienced while at
Combita" is contradicted by the above proffered evidence.  (*See*
Def. Letter at 15).  Murillo has offered no proof of the
conditions in Combita, instead relying on the unsupported
allegations set forth in his sentencing submission.
Additionally, the Government understands that Murillo would have
had administrative remedies available to him under the
regulations of the Colombian prison system and civil remedies
under the Colombian judicial system.  Murillo has submitted no
evidence indicating that he pursued these remedies.

          In seeking consideration on these grounds, the
defendant relies on the Second Circuit's decision in *United
States v. Carty*, 264 F.3d 191 (2d Cir. 2001).  Although the

14

Second Circuit in *Carty* clearly recognized that "pre-sentence confinement conditions may in appropriate cases be a permissible basis for downward departures," *id.*, the subsequent history of that case belies the defendant's assertion that the conditions warrant a departure here.  In *Carty*, the Second Circuit did not affirm a downward departure based on conditions of pretrial confinement, but merely remanded the case to the District Court so that it might "reconsider the defendant's request for a downward departure . . . in light of this holding."  *Id.* at 197. On remand, the late Honorable Allen G. Schwartz carefully considered the defendant's downward departure motion, which was based on the conditions of the Dominican prison where the defendant was held prior to his extradition.  Carty had alleged that during the period of his confinement in the Dominican Republic he was subjected to cruel prison conditions. Specifically, Carty alleged that:

> He was held in a <u>four-foot by eight-foot cell with three or four other inmates</u>. There was <u>no light</u> in his cell.  He received ten to fifteen minutes per day outside of his cell to bathe and was allowed to make only one phone call per week.  He had <u>no running water in his cell</u>.  His <u>only toilet was a hole in the ground</u>.  He was denied access to paper, pens, newspaper, and radio. While incarcerated in the Dominican Republic, he <u>lost forty pounds</u>.

<u>Id.</u> at 193 (emphasis added).

15

Notwithstanding these substandard conditions -- which Carty endured for approximately nine months -- Judge Schwartz nevertheless *rejected* Carty's motion for a downward departure, finding that "in the totality of these circumstances . . . I decline in my discretion to grant him a downward departure as a result of his incarceration with adverse conditions . . . which took place in the Dominican Republic." (Transcript of Court Proceedings, *United States v. Carty*, 95 Cr. 973 & 980 (AGS), dated November 9, 2001, at 24).

Obviously, if the conditions of Carty's confinement were insufficient to justify a downward departure, then the defendant's much less deplorable conditions, which consisted primarily of cold weather, lack of adequate protection and shelter, certain unsanitary conditions, and a generally violent atmosphere while at Combita Prison, (or the solitary confinement and limited family visits he endured while at Itagui Prison) are at least equally unavailing.[2]

In *United States v. Francis*, 129 F.Supp. 612 (S.D.N.Y. 2001), cited by Murillo, the Honorable Robert P. Patterson, Jr.,

---

[2]    Murillo also alleged that while he was confined at La Picota Prison, he suffered cold temperatures, was forced to use cold water for bathing, and had only a concrete slab for use as a bed.  These conditions are a subset of those that Murillo alleges to have suffered while at Combita Prison, and Murillo was only confined at La Picota for "several days."  (*See* Defense Letter at 15).

granted a downward departure where he found, after four days of
hearings involving seven witnesses, that during the defendant's
pretrial confinement at the Hudson County Correctional Center
("HCCC"), he suffered, *inter alia*, an attempted stabbing, weight
loss of 20 to 25 pounds, threats from other inmates, and
"physical and psychological problems, specifically, physical
attacks, significant weight loss, stress, depression, insomnia,
and fear." *Id.* at 617.   Another inmate testified that the HCCC
was ruled by "rampant gang activity," including "intimidation,
extortion, robberies, violence, fights. Like a war." *Id.*  This
inmate further testified that "guards would allow inmates to
fight, without staff interference or discipline, while other
inmates formed a circle around them." *Id.*  Clearly, defendant
Murillo's unsubstantiated allegations fall far short of the
firm, credible evidence of virtual chaos at the HCCC that
prompted Judge Patterson to grant a departure in *Francis*.

        Finally, *United States v. Torres*, 2005 WL 2087818, 01
Cr. 1078 (LMM) (S.D.N.Y. Aug. 30, 2005), involved a defendant
held at Combita, and that case appears to raise similar factual
issues as Murillo's, though Torres was detained at Combita
Prison from January 2002 until February 2003, while Murillo's
period of detention began more than three years later, in 2005.
Following an evidentiary hearing, Judge McKenna granted a one-

level downward departure.  The Government does not agree with the district court's decision to depart in *Torres*, and respectfully submits, that on this record, the Court should not exercise its discretion in granting a sentence at the lowest end of the Guideline range as consideration for the conditions of Murillo's confinement while in Colombia.

**D.    The Statutory Objectives Will Only Be Met If Murillo is Given a Sentence at The High End of the Sentencing Range**

Title 18, United States Code, Section 3553(a), lists the factors to be considered in imposing a sentence.  In light of these factors and their statutory objectives, a sentence at the high end of the Guideline range is warranted.

1.    The nature and circumstances of the offense and the history and characteristics of the defendant.

Nothing about this defendant or his offense conduct calls for a sentence at the low end of the Guidelines range. The offense conduct in this case was extremely serious -- the defendant was involved in the importation of numerous metric tons of cocaine into the United States.  This massive quantity of cocaine exceeds the threshold amount for an offense level of 38 (150 kilograms) by several orders of magnitude.  Similarly, the four-level enhancement for an aggravating role in the offense requires that he be an organizer or leader of a criminal

18

activity involving only five or more participants.  Here,
Murillo was the *de facto* leader of a terrorist and paramilitary
organization which numbered in the thousands.  Finally, the
applicable two-level increase to account for possession of a
firearm in connection with the offense requires that only one
firearm be possessed.  Here, Murillo commanded thousands of
armed paramilitaries as part of his narcotics trafficking.

Similarly, the history and characteristics of the
defendant also justify a sentence at the top end of the
stipulated Guidelines range.  Murillo was the functional
leader of a terrorist and paramilitary organization who used
that position to further his narcotics trafficking activities.
He was in charge of the AUC's narcotics trafficking activities,
including many of its cocaine transportation and financial
operations, and he maintained his position within this
organization from the proceeds of his drug trafficking
activities.  (PSR ¶ 10).  Through this criminal activity,
Murillo has apparently amassed a huge fortune -- $12 million has
already been forfeited to the Colombian Government and Murillo
has an additional "100 properties" which have yet to be fully
surrendered.  (Defense Letter at 18).

     2. The need for the sentence imposed to reflect the
       seriousness of the offense, to promote respect for
       the law, and to provide just punishment for the

19

offense.

Murillo has spent several years flooding the United States with multi-ton shipments of cocaine.  He has been responsible for importing multi-ton quantities of cocaine into the United States, including into New York City, and redirecting the profits back to himself in Colombia.  The magnitude of this offense should be addressed by the seriousness of the sentence imposed by the Court.

3.   The need for the sentence imposed to afford adequate deterrence to criminal conduct.

Murillo's lengthy history of drug trafficking requires a sentence that will promote general deterrence.  In simple terms, Murillo used a terrorist organization to facilitate the importation of numerous metric tons of cocaine, worth tens of millions of dollars, into the United States.  He did so despite understanding that scores of other narcotics traffickers, including those with whom he had worked, had been extradited to the United States for their crimes.  Murillo's disregard for the laws of the United States and the likelihood of extradition compels a serious sentence at the top of the Guidelines range.

4.   The need for the sentence imposed to protect the public from further crimes of the defendant.

Murillo's commitment to narcotics trafficking --
whether for the benefit of the AUC or his personal enrichment --

ceased only because of this prosecution.  Murillo has presented
no evidence suggesting that he would have voluntarily terminated
his drug-trafficking activities were it not for his extradition
to the United States.

       5. <u>The need for the sentence imposed to provide the
          defendant with needed educational or vocational
          training, medical care, or other correctional
          treatment in the most effective manner.</u>

       While educational and vocational training are indeed
important considerations at sentencing, these interests are
perhaps less compelling in this case.  Murillo has apparently
committed to furthering his education during the past three
years of his incarceration in Colombia.  And the Government does
not question the competence or abilities of a man who oversaw
thousands of paramilitaries and a well-established cocaine
trafficking operation with transportation routes across the
hemisphere.  Murillo, who used his considerable talents to
operate a lucrative criminal organization, has not lacked for
educational or vocational training prior to his incarceration.
Lastly, defense counsel also argued that Murillo's various
medical conditions warrant consideration.  The Government
believes that the federal medical centers within the BOP are
adequately equipped to address the medical conditions cited by
Murillo in his submission.

6. The kind of sentences available.

Any non-incarceration sentence would be inappropriate in this case.

7. The Guidelines sentencing range.

As discussed above, Murillo's Guidelines range is 324 to 405 months' imprisonment.  Furthermore, due to the circumstances discussed above, a sentence of 405 months is warranted.

## II.  A Sentence of 405 Months Is Warranted And Not Greater Than Necessary To Account For The Factors Set Forth At Title 18, United States Code, Section 3553(a)

The Government respectfully submits that the factors set forth at Title 18, United States Code, Section 3553(a), counsel in favor of a sentence of 405 months.  The offense conduct in this case was extremely serious.  The defendant was involved in a conspiracy that sent tons of cocaine to the United States for distribution across the nation.  The defendant's role in the offense likewise dictates that he should be sentenced at the top of the range -- he was the *de facto* leader of a large terrorist organization which oversaw the distribution and importation of tons of cocaine.

A sentence of 405 months' imprisonment would be appropriate, and by no means excessive, when measured against the magnitude of Murillo's crimes.  Indeed, similar sentences

have been imposed in this District on drug traffickers who were, if anything, less significant to the international cocaine trade. *See United States v. Alberto Orlandez-Gamboa*, 99 Cr. 654 (TPG) (S.D.N.Y. 2005) (cocaine trafficker extradited from Colombia sentenced to 40 years' imprisonment after guilty plea); *United States v. Ramiro Lopez-Imitola*, 03 Cr. 294 (RPP) (S.D.N.Y. 2006) (heroin trafficker extradited from Colombia sentenced to 40 years' imprisonment after guilty plea); *United States v. Jorge Manuel Torres Teyer*, 01 Cr. 021 (GEL) (S.D.N.Y. 2006) (cocaine trafficker sentenced to 38 years' imprisonment after guilty plea); *United States v. Jorge Asprilla*, 99 Cr. 0101 (TPG) (S.D.N.Y. 2007) (cocaine trafficker sentenced to 30 years' imprisonment after guilty plea).

## Conclusion

For the reasons outlined above, the Government believes that, based on the factors set forth in § 3553(a), 405 months' imprisonment is a reasonable and appropriate sentence in this case.

Dated:    New York, New York

February 9, 2009

Respectfully submitted,

MICHAEL J. GARCIA
United States Attorney


By: _____/s/_____
Eric Snyder/Guruanjan Sahni
Assistant United States Attorneys
(212) 637-2534/2491

## CERTIFICATE OF SERVICE

ERIC SNYDER deposes and says that he is employed in the Office of the United States Attorney for the Southern District of New York, and that on February 9, 2009, he caused a copy of the within Sentencing Memorandum to be served electronically on Margaret Shalley, counsel for Diego Fernando Murillo-Bejarano, by causing a copy of same to be served and filed via the Court's electronic case filing system, and by facsimile.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated:   New York, New York
         February 9, 2009


                            _____/s/_____
                            ERIC SNYDER