MARGARET M. SHALLEY
Fasulo, Shalley & DiMaggio, LLP
225 Broadway, Suite 715
New York, New York 10007
Telephone: (212) 566-6212
Facsimile: (212) 566-8165

*Attorney for Defendant*
Diego Fernando Murillo-Bejarano

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

UNITED STATES OF AMERICA        :

      v.        :    **Case No. S3 03 Cr. 1188(RMB)**

DIEGO FERNANDO MURILLO-BEJARANO,    :

         Defendant.       :

------------------------------------------------------------x

## MEMORANDUM OF LAW IN OPPOSITION TO THE EX PARTE MOTION OF ALBA INES RENDON GALVIS TO ENFORCE HER RIGHTS TO BE HEARD BEFORE SENTENCING AND RECEIVE RESTITUTION

# TABLE OF CONTENTS

INTRODUCTION…………………………………………………………………………………2

FACTUAL BACKGROUND………………………………………………………………………...2

ARGUMENT………………………………………………………………………………………7

    MS. RENDON IS NOT A "CRIME VICTIM" UNDER THE CVRA…………..........……7

    MR. VARGAS' DEATH WAS NOT DIRECTLY CAUSED BY THE
    DEFENDANT'S PARTICIPATION IN THE CHARGED CONSPIRACY………..….12

    THE COMPLEXITY OF DETERMINING PROXIMATE CAUSATION
    AND RESTITUTION……………………………………………………………………18

CONCLUSION…………………………………………………………………………………...20

# TABLE OF AUTHORITIES

**Page**

## CASES

*Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687 (1995)...................15

*Hughey v. United States,* 495 U.S. 411 (1990)…….....………………………….....8,10,14,16

*Kenna v. U.S. District Court,* 435 F.3d 1011 (9th Cir. 2006)……………………………......….9

*United States v. Blake*, 81 F.3d 498 (4th Cir. 1996) ...…………………………………………11

*United States v. Brock-Davis*, 504 F.3d 991 (9th Cir. 2007)……………………………....…..14

*United States v. C.R. Bard, Inc.*, 848 F. Supp. 287 (D. Mass. 1994)……………………….…..19

*United States v. Guevara-Toloso*, 2005 WL 1210982, M 04-1455
    (E.D.N.Y., May 23, 2005)…………………………………………………………………...9

*United States v. Hunter*, 2008 WL 53125, 07 Cr. 307 (DAK),
    (D. Utah, Jan 3, 2008)…………………………………………………………......8,9,16,17

*United States v. Kones*, 77 F.3d 66 (3d Cir. 1996)………………………………………….........19

*United States v. Rutgard*, 116 F.3d 1270 (9th Cir. 1997)……………………….. ……………….14

*United States v. Schwartz*, 2006 WL 1662899 (D. Conn. 2006)…………………………….....…15

*United States v. Sharp*, 463 F.Supp.2d 556 (E.D.Va. 2006)……………...…………….8,9,10,14,16

*United States v. Turner*, 367 F. Supp.2d 319 (E.D.N.Y. 2005)……………………………………8

*United States v. Vaknin*, 112 F. 3d 579 (1st Cir. 1997)……………………………….…….16,17

## FEDERAL STATUTES

18 U.S.C. § 3663…………………………………………………………….......…………....10,14,18

18 U.S.C. § 3771……………………...…………….....………………………………………*passim*

21 U.S.C. § 963………………………………………………………………....………………11, 7

## LEGISLATIVE MATERIALS

150 Cong. Rec. S 10910, 10912 (daily ed. Oct. 9, 2004)…………………………………………9

## MISCELLANEOUS

Blacks Law Dictionary, at 1225 (6th ed. 1990)……………………………………………………9

Bryan A. Garner, *Modern Legal Usage*, at 711 (2d ed. 1995)……………………………………..9

Paul Richter and Greg Miller, Colombia Army Chief Linked to Outlaw Militias,
*Los Angeles Times* (March 25, 2007)……………………………………………..…..3

## INTRODUCTION

This memorandum is respectfully submitted in response to the *ex parte* motion filed by Ms. Alba Ines Rendon Galvis, to enforce her rights under the Crime Victim's Rights Act, as codified in Title 18 U.S.C. § 3771 (hereinafter referred to as the "CVRA"). For all of the reasons outlined below, Mr. Murillo-Bejarano respectfully submits that Ms. Rendon does not have standing as a "victim" pursuant to the CVRA, and therefore the Court must exclude any testimony and evidence submitted by Ms. Rendon from the defendant's sentencing hearing. Additionally, the issues presented are too complex to permit the Court to order restitution.

## FACTUAL BACKGROUND

The Autodefensas Unidas De Colombia (AUC) was a paramilitary organization based in Colombia which engaged in warfare with the Fuerzas Armadas Revolucionarias de Colombia (FARC), the ELN and other guerilla groups. (PSR ¶9) Various paramilitary groups and guerillas (FARC and ELN) have been engaged in a large scale civil war throughout Colombia for the past 40 years. (Rendon Motion, Exhibit 14 at 1) Both sides in the conflict are supported in part from money earned from drug trafficking. For instance, in March 2002, the Colombian National Police conducted seizures of several cocaine base laboratories run by the FARC. (Rendon motion, Exhibit 1 at 3) The FARC used kidnappings and bombings to further their agenda. For example, in the month of April 2002 the FARC: disguised as Colombian Army soldiers set off explosions in downtown Cali killing one and kidnapping 12 local legislators; fired a rocket in an attempt to destroy a television broadcasting facility in Bogata; bombed Barranquilla in a failed attempt to kill then presidential candidate Uribe, killing 3 and injuring 15; and

2

kidnapped the governor of Antioquia, the former Colombian Minister of Defense, an American citizen and several priests. (Rendon Motion, Exhibit 1 p. 3) In 2002, Comuna 13 was controlled by urban militias called CAPS, the ELN and the FARC; they had absolute control of the area and large numbers of homicides, disappearances and kidnappings were reported. (Rendon Motion: Exhibit 11 at 7; Exhibit 20 at 4; Murillo, ¶ 10). Comuna 13 was a poor area in the central-western hills of Medellin. (Rendon Motion, Exhibit 1) The FARC had been carrying out a series of kidnappings of wealthy citizens from Medellin, including the present Mayor's niece, and then holding them captive in the FARC controlled Comuna 13 area. (Rendon motion Ex. 11 at 7; Murillo, ¶ 12)

Notably, the area surrounding the city of Medellin has been afflicted by violence over the past 20 years. During the late 1980s and early 1990s, a period when Pablo Escobar was leader of the Medellin cartel, murder rates in the peripheries of Medellin, including Comuna 13, soared rapidly. After the death of Pablo Escobar in 1993, gangs and guerilla groups seized control of the community. (Rendon motion, Exhibit 3, p. 2; Exhibit 10, p. 3; Murillo ¶10) An alliance of national police, military and local security forces finally broke the strangle hold these groups had on the neighborhood with a series of military operations in 2001 and 2002, culminating in Operation Orion. (Rendon Motion, Exhibit 9, p. 1) In 2002, the Colombian police, army and paramilitaries, including army chief General Mario Montoya, and Police General Leonardo Gallego, jointly planned and conducted a series of military operations. [1] (Rendon motion, Exhibit 11 at 7; Murillo, ¶ 13, 15) This Operation, in October 2002, sent 3,000 Colombian army

---

[1] *See, e.g.,* Paul Richter and Greg Miller, Colombia Army Chief Linked to Outlaw Militias, *Los Angeles Times* (March 25, 2007) (Ex. 1).

soldiers and police, supported by heavily armed helicopter gunships, through a vast shantytown area controlled by the FARC in an effort to eliminate Marxist guerrillas from Comuna 13. (Rendon Motion, Exhibit 10 at 8) During this time period, 1,500 army troops conducted house to house searches rounding up suspects while accompanied by informants dressed in ski masks and fatigues. In response, the FARC dispatched fighters to prevent the military and paramilitary from gaining control of the area. (Rendon Motion, Exhibit 10 at 8). Fighting continued throughout 2002, and as a result of Operation Orion, at least 20 kidnapping victims were released. (Murillo, ¶ 22) The military and police were assisted during these operations by the paramilitary members of Bloque Cacique Nutibara (BCN). (Rendon Motion, Ex. 1; Ex 2 at 2; Ex 12 at 13; Murillo, ¶ 15)

During Operation Orion, Mr. Murillo-Bejarano was in the area of Cordoba, not in the city of Medellin. (Murillo ¶ 17) The BCN member in charge of operations in Comuna 13, who coordinated with the military and police, was Kinkon. (Rendon Motion, Ex. 21 at 6; Ex. 12 at 9; Murillo ¶ 18) The National Unit on Human Rights and International Humanitarian Law charged Murillo-Bejarano with aggravated homicide, forced disappearance and other crimes after discovering bodies, including the body of Ms. Rendon's son. The National Unit concluded that the deaths resulted from armed conflict. (Rendon motion, Exhibit 2 at 4) [2] In response to the charges, the defendant admitted "that the presence of the self-defense forces in the Comuna 13 ... was due to the political context and that his mission was to help the community overcome the problems." (Rendon motion, Exhibit 21 at 6) He further stated that alias "Simon y alias "Kinkon"

---

[2] Rendon Motion Exhibit 2 and Exhibit 20, a decision from the Criminal Court of Specialized Circuit of Medellin which proffers a projected sentence, both contain findings based on witness statements that are summarized in a conclusory form and were not subject to cross-examination.

entered the area with a group of fighters with the goal of facing the subversion that was established there, but in the middle of the dispute, the state carried out the so-called Operation Orion, taking control over the whole comuna, after which came the demobilization of the Bloque Cacique Nutibara." Most importantly, Murillo-Bejarano acknowledged that, "...despite the fact that the order was not to commit any unnecessary serious crimes, excesses were committed, given the size of the organization." The defendant had no specific information related to the death of Ms. Rendon's son and he was not the individual who committed the murder. Moreover there is no evidence presented that he knew in advance that the murders would occur. The Judicial Branch of the Public Authority Third Criminal Court of the Specialized Circuit of Medellin (Rendon motion, Exhibit 21), imputed penal responsibility to Mr. Murillo-Bejarano based upon his leadership of the self-defense forces in that area. That responsibility resulted from his failure as a military boss, to properly control his troops, which is crime under Colombia bylaw 742 of 2002. (Rendon Motion, Exhibit 21 at 13). The defendant accepted responsibility for all crimes charged, except drug trafficking and distribution. Notably, although the defendant was informed of activities through reports of operations after they occurred, there is no evidence presented that he knew about the crimes in advance, or sanctioned them. (Rendon motion, Exhibit 21 at 9-10).

While the Criminal Court in Medellin proffered a projected sentence of 320 months in prison, the Court abstained from issuing sanctions for restitution and damages, and ruled that such issues be filed or taken up with the civil term, or in the alternative, a motion proceeding within the reparation process under the Justice and Peace Law. (Rendon Motion, Exhibit 21 at 16). Several years ago, Colombia's President, Alvaro

5

Uribe, initiated a Peace Process with the defense groups in Colombia. The Colombian Government enacted the Justice and Peace Law in 2005, setting forth the rules under which paramilitary members would demobilize and be brought to justice. The Justice and Peace Law was drafted as a combination of different human rights laws from around the world. Colombia's Peace Process offers reduced sentences, but no amnesty, and reparations must be paid to victims. Mr. Murillo-Bejarano voluntarily surrendered himself to Colombian authorities on May 27, 2005, and to date, he has continued to be a participant in the Peace Process. He has continued to turn over real estate properties to Justice and Peace despite his extradition to the United States. Accordingly, the proper forum for Ms. Rendon's claims, as the Criminal Court of the Circuit of Medellin ruled, are in civil courts in Colombia and through the reparation process under the Justice and Peace Law.

Mr. Murillo-Bejarano has admitted that he was *a* leader of the AUC, holding the title of Inspector General. In addition to his role as Inspector General, the defendant was the commander of three Bloques within the AUC: Heroes de Tolova, Heroes de Granada, and Cacique Nutibara. (Murillo, ¶ 4) The defendant and all the Bloque commanders of the AUC used money obtained from taxes collected from narcotics trafficking to finance their military and political operations. Although, the defendant collected taxes on cocaine in the Bloques that he controlled; he was not in charge of all narcotics trafficking activities, including all cocaine transportation and financial operations for the AUC. Each Bloque commander was responsible for his individual Bloque. (Murillo, ¶5) The Cacique Nutibara Bloque was funded by money from siphoning gasoline from a pipeline, contributions from wealthy businessmen, business and hotel owners, taxes on buses and

6

large businesses, and taxes collected from narcotics trafficking. (Rendon motion, Exhibit 11 at 3; Exhibit 12 at 11; Murillo, ¶6).

On June 17, 2008, the defendant entered a guilty plea to Count One of the Indictment pursuant to a Plea Agreement. Count One charged the defendant with conspiracy to: (1) import into the United States five kilograms and more of cocaine; and (2) distribute five kilograms and more of cocaine knowing and intending that the cocaine would be unlawfully imported into the United States, all in violation of Title 21, United States Code, Section 963. At his guilty plea, Mr. Murillo-Bejarano allocuted that he conspired through the AUC, which he described as a "military political and anti-communist" organization, to create a plan or scheme of exit taxes for boats and ships in the Colombian ports carrying cocaine which were destined for the United States. (Plea Transcript p. 25).

## MS. RENDON IS NOT A "CRIME VICTIM" UNDER THE CVRA

Ms. Rendon is not a crime victim under the CVRA because the harm to her son was not a direct and proximate result of conspiring to import cocaine into the United States. The CVRA provides that "[i]n any court proceeding involving an offense against a crime victim, the court shall ensure that the crime victim is afforded" certain rights. Title 18 U.S.C. § 3771(b). Those rights include, among others, "[t]he right to be reasonably heard at any public proceeding in the district court involving release, plea, sentencing, or parole proceeding," and "the right to full and timely restitution as provided in law." Title 18 U.S.C. § 3771(a)(1)(4), § 3771(a)(1)(6). The CVRA, defines "crime victim" as "a person directly and proximately harmed as a result of the commission of a

7

Federal offense." 18 U.S.C. § 3771(e). In other words, a person must be directly harmed as a result of the offense and the harm must be proximate to the crime.

Congress passed the CVRA knowing that the Supreme Court has interpreted similar language in prior victims' rights acts *not* to refer to uncharged conduct. See *United States v. Turner*, 367 F. Supp.2d 319, 326 (E.D.N.Y. 2005) (recognizing that the House report on the CVRA noted that 18 U.S.C. § 3771(a)(6) "makes no change in the law with respect to victims' ability to get restitution."); *United States v. Sharp*, 463 F.Supp.2d 556, 560 (E.D.Va. 2006); *United States v. Hunter*, 2008 WL 53125, 07 Cr. 307 (DAK), (D. Utah, Jan 3, 2008). Moreover, *Hughey v. United States*, 495 U.S. 411, 110 S.Ct. 1979 (1990), held that the Victim and Witness Protection Act of 1982, authorized restitution to a victim *only* for loss caused by the specific conduct which forms the basis for a defendant's offense of conviction. *Id*. at 413. Since the statute at issue in *Hughey* and the CVRA use similar definitions of victim, the same reasoning would exclude victims of uncharged conduct from the class of those entitled to participatory rights under the CVRA. *Turner*, 367 F.Supp.2d at 326-7.

However, Ms. Rendon argues that she was "directly and proximately" harmed by Murillo-Bejarano's federal offense conduct (conspiring to import cocaine into the United States) because her son was murdered and the defendant accepted responsibility as the leader of the BCN, because he had failed to control his troops, whom he acknowledged had committed excesses. (Murillo, ¶21) In support of this argument, Ms. Rendon cites to the floor debate of the CVRA, during which one of the sponsors of the bill noted that the definition of "victim" in the CVRA is an "intentionally broad definition because all victims of crime deserve to have their rights protected, whether or not they are the victim

8

of the count charged." 150 Cong. Rec. S 10910, 10912 (daily ed. Oct. 9, 2004) (statement of Sen. Kyl). Notably, floor statements are not given the same weight as other types of legislative history such as committee reports, because they generally represent only the view of the speaker. *See United States v. Sharp* at 556, citing *Kenna v. U.S. Dist. Court of the Cent. Dist. Of Cal.*, 435 F.3d 1011, 1015 (9ᵗʰ Cir. 2006). Moreover, the CVRA only applies if Rendon was directly and proximately harmed as a result of the commission of the defendant's federal offense. 18 U.S.C. § 3771(e). Because the crimes the defendant has accepted responsibility for were violations under Colombia bylaw 742, (Rendon Motion, Exhibit 21 at 13), any persons harmed by those crimes are not "crime victims" within the meaning of the CVRA. *See United States v. Guevara-Toloso*, 2005 WL 1210982, M 04-1455 (ARL), (E.D.N.Y., May 23, 2005) (holding that when a defendant is accused of a federal offense an element of which is his previous conviction for a predicate offense, the victims of that earlier offense are not victims under the CVRA).

The term "proximate" means "lying very near or close." Bryan A. Garner, *Modern Legal Usage*, at 711 (2d ed. 1995). Proximate cause is term of art that emphasizes "the continuity of the sequence that produces an event" and refers to "a cause of which the law will take notice." *Id. Black's Law Dictionary* defines it as "[t]hat which, in natural and continuous sequence, unbroken by any efficient intervening cause, produced injury, and without which the result would have not happened." Blacks Law Dictionary, at 1225 (6ᵗʰ ed. 1990). *United States v. Hunter*, 2008 WL 53125, 07 Cr. 307 (DAK), (D. Utah, Jan. 3, 2008). In *United States v. Sharp*, 463 F.Supp.2d 556, 560 (E.D.Va. 2006), one of the few cases examining the extent to which a person may qualify

9

as a victim under the CVRA, the court looked not only to the language of the CVRA, but to cases applying the Victim and Witness Protection Act (VWPA) and the Mandatory Victims Restitution Act (MVRA), because all three statutes use the language "directly and proximately harmed" and the definitions in these statutes are nearly identical.

In one of the cases analyzed by the *Sharp* court, *Hughey v. United States*, 495 U.S. 411 (1990), the Supreme Court addressed the authorization of restitution under the Victim and Witness Protection Act (VWPA), which defines a victim as a "person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered." Title 18 U.S.C. § 3663(a)(2). The Supreme Court found that restitution was only authorized for loss caused by the **specific** conduct which formed the basis of a defendant's offense of conviction. *Hughey*, 495 U.S. at 413. Because the district court in *Hughey* included restitution for the damage caused by the defendant's behavior surrounding all six original charged counts, rather than the much smaller amount of damage attributable to the single count to which he pled guilty, the Supreme Court found that **the district court exceeded its authority in granting restitution for loss not caused by the specific conduct that was the basis of the loss.** *Id.* at 422.

In *Sharp*, the district court ruled that the former domestic partner of a marijuana user who allegedly received marijuana from the defendant was not a victim entitled to provide a victim impact statement pursuant to the CVRA on a conviction for conspiracy to distribute marijuana, since there was insufficient evidence that the partner was directly and proximately harmed by the defendant's conduct. *Sharp*, 463 F. Supp.2d 556, 566. The court held that the closer the relationship between the actions of the defendant and the harm sustained, the more likely that proximate harm exists, and that the girlfriend

10

"must show more than a mere possibility that an alleged act (the defendant's federal crime) caused her boyfriend to physically and emotionally abuse her. *Id.* at 565-567.

Sharp pled guilty to conspiracy to possess with intent to distribute marijuana in violation of Title 21 U.S.C. §§ 841(a)(1), 841(b)(1)(D), and 846. The elements of that offense were: (1) an agreement to possess marijuana with intent to distribute existed between two or more persons; (2) the defendant's knowledge of the illegal conspiracy; and (3) the defendant knowingly and voluntarily became a part of this conspiracy. *Id.* at 564. The Fourth Circuit held that the girlfriend was unable to establish "victim" status under the CVRA because, "The specific conduct underlying the elements of conspiracy to possess with intent to distribute marijuana that were the basis for the defendant's offense of conviction does not include assault and battery, or any other violent conduct." *Id.* at 564, citing *United States v. Blake*, 81 F.3d 498, 506 (4th Cir. 1996) (holding that the conduct forming the offense of fraudulent use of unauthorized access devices does not include the theft of the access devices). Moreover, the court reasoned that the abuse allegedly inflicted on the girlfriend neither assisted the defendant in commission of his federal offense, nor was an essential element necessary for accomplishment of his criminal acts. *Id.* at 564.

The analysis used by the district court in *Sharp* is particularly instructive in this matter. Mr. Murillo-Bejarano pled guilty to conspiracy to import and distribute 5 kilograms and more of cocaine into the United States in violation of Title 21 U.S.C. § 963. The elements of the offense are: (1) an agreement to import cocaine with intent distribute it into the United States existed between two or more persons; (2) the defendant's knowledge of the illegal conspiracy; and (3) the defendant knowingly and

11

voluntarily became a part of this conspiracy. Thus, just as the court determined in *Sharp*, the specific conduct underlying the elements of conspiracy to import with intent to distribute that were the basis for Mr. Murillo-Bejarano's conviction, does not include any violent conduct, such as the murder of Mr. Vargas. Nor did Mr. Vargas' murder assist the defendant in the commission of his federal offense; nor was it an essential element in the accomplishment of his criminal acts.

## MR. VARGAS' DEATH WAS NOT DIRECTLY CAUSED BY THE DEFENDANT'S PARTICIPATION IN THE CHARGED CONSPIRACY

While Ms. Rendon's motion proffers that her son's murder occurred in furtherance of the defendant's drug trafficking activities within the AUC, there is no evidence that Mr. Vargas was involved with drug trafficking activity, nor any evidence that his murder was committed in furtherance of the defendant's importation conspiracy. Mr. Vargas was murdered in 2002, in Comuna 13, an area plagued by violence and civil warfare between urban militias, guerillas (FARC) and paramilitaries. Operation Orion, was a joint operation conducted by the Colombian police, army and paramilitaries in Comuna 13, in an effort to eliminate the Marxist guerillas (FARC) from the area. During Operation Orion and immediately thereafter, Mr. Murillo-Bejarano was in Cordoba, not Medellin, and another BCN member, Kinkon, was in charge of coordinating operations in Comuna 13 with the military and police. (Murillo, ¶17, 18) While Mr. Murillo-Bejarano has acknowledged that in his role as Commander of BCN, he gave the order not to commit any unnecessary serious crimes in Comuna 13, excesses were committed given the size of the organization. (Rendon Motion, Exhibit 21) The actions taken in Comuna 13 were ordered by Kinkon. (Murillo at ¶18). Murillo-Bejarano has no specific

12

information related to the death of Ms. Rendon's son and he was not the individual who committed the murder. (Rendon Motion, Exhibit 21).

Moreover, there is also no evidence establishing that Mr. Vargas was involved in narcotics trafficking or killed as a result of a battle over a drug lab in the area. The argument that the BCN specifically targeted the area of Comuna 13 to gain access to a "strategic corridor" necessary for its drug conspiracy is simply untrue. In support of this proposition, Ms. Rendon cites to the testimony of a forensic criminal investigator who uses the term "strategic corridor" to refer to an area where trenches and encampments were set up to control the district, not a drug trafficking route. (Rendon Motion, Exhibit 11 at 3) Moreover, Rendon also cites to an article from the Colombia Journal which refers to the area of Comuna 7, not Comuna 13, as a strategic corridor. Further, according to the statement of a BCN member, the drug laboratory that partially funded BCN activities existed at the time of Operation Orion. (Rendon Motion, Exhibit 12 at 11; Exhibit 13 at 2). In other words, there was no reason for the BCN to assist in the take over of Comuna 13 for a drug laboratory they already possessed. [3] Moreover, according to the statement of a criminal investigator, the laboratory was located in San Cristobal which is not located in Comuna 13. (See Exhibit A to Murillo Affidavit) There simply is no verifiable evidence from which to conclude that the actions taken in Comuna 13 were in furtherance of the charged drug conspiracy. Therefore, Mr. Vargas was not "directly and proximately" harmed as a result of Mr. Murillo-Bejarano's commission of his federal offense.

---

[3] The "drug laboratory" discovered in San Cristobal on October 5, 2003 was described as "a semi-rustic dwelling, made of mud blocks, with a cement floor, a kitchen and 5 rooms in bad repair" (Rendon Motion, Exhibit 13 at 2). Clearly, it could have easily been relocated and does not seem to have contained sophisticated equipment.

Since Mr. Murillo-Bejarano's offense includes an element a conspiracy, Ms. Rendon argues that she is a victim because she was harmed by an act taken in furtherance of the conspiracy. She argues that when the charged crimes include a scheme, conspiracy, or pattern of criminal activity, a "crime victim" includes those harmed by the defendant's scheme "even beyond the counts of conviction." *United States v. Brock-Davis*, 504 F.3d 991, 999 (9th Cir. 2007) (quoting *United States v. Rutgard*, 116 F.3d 1270, 1294 (9th Cir. 1997) (Rendon Memorandum of Law, p. 9). However, all of the cases cited by Ms. Rendon were Ninth Circuit cases that did not deal specifically with the CVRA. Rather, these cases were based upon a 1990 amendment to the VWPA, which provided that "a victim" was "any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy or pattern." Title 18 U.S.C. § 3663(a)(2). That specific substantive change in the law under the VWPA, has not been implemented with respect to the CVRA, which is at issue in this case. Federal courts analyzing the CVRA have continued to use the Supreme Court's analysis in *Hughey v. United States,* 495 U.S. 411, 110 S. Ct. 1979 (1990), which authorizes restitution to a victim only for loss caused by the specific conduct forming the basis for a defendant's offense of conviction. This analysis was used by the Department of Justice (DOJ) in a December 19, 2008 letter sent to Ms. Rendon's counsel stating, "United States courts that have construed the definition of "victim" under the CVRA have looked to the offenses at issue in a particular prosecution. *See, e.g., United States v. Sharp*, 463 F. Supp 2d 556, 563 (E.D. Va. 2006)." (See Rendon Motion, Exhibit 30, p. 2)

Moreover, Ms. Rendon's motion fails to establish that the acts surrounding her son's death were taken in furtherance of the charged narcotics conspiracy. In fact, the

14

acts surrounding her son's death are unrelated to any drug conspiracy. The temporal proximity between Mr. Vargas' murder and the defendant's importation of drugs to the United States is too attenuated and unrelated. The closer the relationship between the actions of the defendant and the harm sustained, the more likely that proximate harm exists. See *Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 713, 115 S. Ct. 2407 (1995) (O'Connor, J., concurring). In essence, to qualify as a "victim," Ms. Rendon would need to show a "direct and proximate" link between Mr. Murillo-Bejarano's act of importing cocaine into the United States and her son's death. She argues that the BCN and AUC were supported by profits from drug trafficking. However, she is unable to show that this particular series of military operations were funded by cocaine that the defendant sent to the United States. Further, BCN's operations were primarily funded by profits from the siphoning of a gasoline pipeline in San Cristobal, contributions from wealthy businessmen, business owners, hotel owners, and taxes on buses and large businesses. (Murillo Affidavit ¶ 6, 8; Rendon Motion, Exhibit 11 at p. 3; Exhibit 12 at p. 11) Accordingly, Ms. Rendon's claimed injuries in this case are too attenuated to qualify her as a "victim" under the CVRA; and therefore, she lacks standing to testify at the Defendant's sentencing hearing.

Courts have consistently reasoned that where there is an insufficient nexus between the offense and the harm alleged, a person is not a crime victim under the CVRA and is not entitled to the rights afforded to crime victims. For example, in *United States v. Schwartz*, 2006 WL 1662899 (D. Conn. 2006), the defendant pled guilty to two counts of false statements in violation of 18 U.S.C. § 1001, for statements he made to agents and officers of the IRS in connection with the federal income tax returns of a company for

which he worked, as well as his own personal income tax returns. The CEO of the company and his wife petitioned the court for restitution to compensate them for tax penalties and interest they sustained as a result of the defendant's conduct. The Court, held that the CEO and his wife did not constitute victims of crime under 18 U.S.C. 3663(a)(2), which defines a victim as a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered, and noted that the CVRA (18 U.S.C. § 3771(e)) uses the same definition of victim.

*United States v. Hunter*, 2008 WL 53125, 07-CR-307 (DAK) (D. Utah, Jan. 3, 2008), is consistent with this analysis. In *Hunter*, Vanessa Quinn was shot and killed by Sulejman Talovic, while shopping at a mall. Quinn was shot with a handgun that Talovic bought from the defendant Hunter, who was charged with unlawfully selling the firearm to Talovic because he reasonably believed him to be a minor, in violation of Title 18 U.S.C. §§ 922(x)(1) and 924(a)(6)(B)(i). Quinn's parents brought a motion seeking declarations that Vanessa Quinn was a "victim" of Hunter's offense and that they could assert rights on her behalf pursuant to the CVRA. *Id.* at *1. The district court, in analyzing the definition of victim under the CVRA, looked to *Hughey v. United States*, 495 U.S. 411 (1990) and *United States v. Sharp*, 463 F.Supp.2d 556 (E.D.Va. 2006) for guidance, and also examined *United States v. Vaknin*, 112 F. 3d 579, 590 (1st Cir. 1997), in which the First Circuit required the government to show, under the VWPA, that the causal nexus between the conduct underlying the offense of conviction and the loss of the "victim" was not too attenuated (either factually or temporally). The *Vaknin* court explained that "[t]he watchword is reasonableness." A sentencing court should undertake an individualized inquiry; what constitutes sufficient causation can only be determined

16

case by case, in a fact-specific probe. *Vaknin*, 112 F. 3d 579 at 590. In applying the recognized standards for proximate harm, the district court in *Hunter* concluded that Quinn was not directly and proximately harmed by the defendant's sale of a firearm to a minor. *Hunter*, 2008 WL 53125 at \*4. While the court noted that the family members were undoubtedly victims of Talovic's crimes, the nexus between the defendant's act of selling a firearm to a minor and Talovic's acts were too factually and temporally attenuated. *Id*.

Similarly, in this matter, Ms. Rendon must demonstrate more than a mere possibility that her son, Mr. Vargas, was murdered in furtherance of the defendant's conspiracy to import cocaine into the United States. There is absolutely no evidence establishing that Mr. Vargas was murdered to somehow facilitate the importation conspiracy that Mr. Murillo-Bejarano pled guilty to under the federal laws of the United States. Nor is there any evidence that money earned from importing cocaine into the United States was used to pay the BCN members involved in the activities that occurred in Comuna 13 in November 2002.

Accordingly, based upon the foregoing, Ms. Rendon's injuries in this case are too attenuated to qualify her as a "victim" as that term is used in the CVRA, and therefore, she lacks standing to testify at the Defendant's sentencing hearing. While the defendant does not want to minimize in any way the harm suffered by Ms. Rendon and those who were killed, injured, or had loved ones killed or injured during the ongoing civil conflict between the paramilitaries and the guerillas, the harm that Ms. Rendon suffered is not sufficiently connected to Mr. Murillo-Bejarano's offense of unlawfully conspiring to import cocaine into the United States, to be the direct and proximate cause of the harm.

17

## THE COMPLEXITY OF DETERMINING PROXIMATE
## CAUSATION & RESTITUTION

A determination of fault, causation, and amount of restitution in this case would clearly overwhelm an otherwise straightforward sentencing proceeding. In analyzing the CVRA, federal courts have examined two other victims' statutes containing similar language – the Victim and Witness Protection Act of 1982 ("VWPA"), 18 U.S.C. § 3663, and the Mandatory Victims Restitution Act of 1986 ("MVRA"), 18 U.S.C. § 3663A. Both Section 3663A and Section 3663 authorize the Court to decline to order restitution if the issues are too complex and if they would overwhelm the sentencing proceeding. See 18 U.S.C. § 3663A(c)(3)(B); 18 U.S.C. 3663(a)(1)(B)(ii). These provisions thus call for a weighing of the burden of adjudicating the restitution issues against the desirability of immediate restitution – or otherwise stated, a weighing of the burden that would be imposed on the court by adjudicating restitution in the criminal case against the burden that would be imposed on the victim by leaving him or her to other available legal remedies. In this matter, a Colombian court has ruled that Ms. Rendon's remedies lie in the civil courts and the Justice and Peace Process. Moreover, if Ms. Rendon is a victim because the AUC was funded by drug trafficking, more than 150,000 registered victims of the Justice and Peace Process may be victims who may be entitled to restitution. (*See* Rendon Motion, Exhibit 37)

In *United States v. Kones*, 77 F.3d 66, 69 (3d Cir. 1996), the Third Circuit reasoned that, "Nothing in the legislative history evidences an expectation that a sentencing judge would adjudicate, in the course of the court's sentencing proceeding, all civil claims against a criminal defendant arising from conduct related to the offense ...The kind of case that Congress had in mind was one in which liability is clear from the

information provided by the government and the defendant and all the sentencing court has to do is calculate damages." As outlined above, the issue of whether Ms. Rendon was "directly and proximately" harmed is complex. The victims' statutes "counsel against construing the statute[s] in a way that would bring fault and causation issues before the sentencing court that cannot be resolved with the information otherwise generated in the course of the criminal proceedings on the indictment." *Kones*, 77 F.3d at 69.

This is not the kind of case where liability is clear. Accordingly, because the determination of "direct and proximate" cause and restitution issues are far from simple and would overwhelm the sentencing proceeding, and particularly in light of the fact that these issues are intertwined with criminal charges of wrongful conduct that are already pending as part of the Justice and Peace Process in Colombia, the Court should decline to consider Ms. Rendon's claims. See *United States v. C.R. Bard, Inc.*, 848 F. Supp. 287, 292-93 (D. Mass. 1994) ("It would be very time-consuming and complicated to litigate in this criminal case [the issue of proximate causation]"). Accordingly, an individual civil suit is a much more appropriate means of addressing restitution. Moreover, if the Court finds that Ms. Rendon is a victim, the Court must then conduct a mini-trial to determine the damages associated with the loss of life of a 20 year old Colombian male, who was employed selling mazamorra in the streets of Medellin. (Rendon motion, Exhibit A, p.1)

19

## CONCLUSION

For all of the foregoing reasons, the defendant respectfully submits that Ms. Rendon is not a victim pursuant to the CVRA. She was not directly and proximately harmed as a result of Mr. Murillo-Bejarano's commission of the federal offense to which he pled guilty. Further, she is therefore not entitled to restitution under the CVRA.

Dated: February 26, 2009
      New York, New York

*Margaret M Shalley (kmc)*
Margaret M. Shalley
Fasulo, Shalley & DiMaggio, LLP
225 Broadway, Suite 715
New York, New York 10007
Telephone: (212) 566-6212
Facsimile: (212) 566-8165

*Attorney for Defendant*
Diego Fernando Murillo-Bejarano

cc:    AUSA Eric Snyder
      Joshua A. Plaut
      Leo P. Cunningham
      Roxanna Altholz