UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA                    :

          -v-                               :        S3 03 Cr. 1188 (RMB)

DIEGO FERNANDO MURILLO-BEJARANO,            :

                                            :

                    Defendant.

- - - - - - - - - - - - - - - - - - - x

# GOVERNMENT'S MEMORANDUM OF LAW IN
## OPPOSITION TO MS. ALBA INES RENDON GALVIS'S MOTION
## PURSUANT TO THE CRIME VICTIMS RIGHTS ACT

LEV L. DASSIN
Acting United States Attorney
for the Southern District of
New York

ANIRUDH BANSAL/ERIC SNYDER/ANJAN SAHNI/JESSE M. FURMAN
Assistant United States Attorneys
     - Of Counsel -

**PRELIMINARY STATEMENT**

The Government respectfully submits this memorandum of law in opposition to Ms. Alba Ines Rendon Galvis's motion pursuant to the Crime Victims' Rights Act ("CVRA").  Although Ms. Rendon's son, Juan Fernando Vargas Rendon, was undeniably the victim of a horrible crime, he was not a "crime victim" with respect to the specific offense charged here, as that term is defined in the CVRA.  Accordingly, Ms. Rendon's motion to be declared a crime victim under the CVRA in this particular case should be denied.

The CVRA defines a "crime victim" as "a person directly and proximately harmed as a result of the commission of a Federal offense."  18 U.S.C. § 3771(e).  Applying that definition, courts have held that to qualify under the statute, a person must have been harmed directly and proximately by conduct underlying an element of the defendant's offense.  Here, the defendant's offense –- agreeing with others to import and distribute cocaine –- did not directly and proximately cause Mr. Vargas's death.

In contending otherwise, Ms. Rendon asks the Court to look beyond the elements of the defendant's offense to allegedly related criminal conduct.  To do so, however, would not only be contrary to the plain language of the statute, but it may also require courts in many cases to engage in extensive factfinding at early stages of a criminal proceeding to determine the full scope of a particular defendant's criminal conduct.  Imposing

such a burden on the courts and the Government would make bringing defendants like Murillo-Bejarano to justice impracticable.  There is no reason to believe Congress intended such a result.

Indeed, the facts of this case make plain the pitfalls of looking beyond the elements of a particular offense in determining who qualifies as a "crime victim" under the CVRA. Although Ms. Rendon asserts that her son was killed in furtherance of the defendant's drug trafficking activities, her proffered evidence makes clear that the defendant and his paramilitary organization, the *Autodefensas Unidas de Colombia* ("AUC"), committed acts of violence for many reasons, only one of which was drug trafficking, including: fighting its political enemy, the *Fuerzas Armadas Revolucionarios de Colombia* ("FARC"); political retaliation; social "cleansing"; and other nefarious but unrelated criminal ventures.  If Ms. Rendon's construction of the CVRA were correct, the Court would have to hold a mini-trial to determine not only whether the defendant was responsible for her son's murder but how, if at all, that murder was related to the defendant's drug trafficking offense.  Indeed, the Court may have to do so for all similarly situated claimants – a group that by IHRA's count may number in excess of 13,000 people.

The CVRA calls for no such thing.  Ms. Rendon's son was plainly the victim of a crime.  And it may well be, as the

evidence submitted in support of Ms. Rendon's motion appears to indicate, that the defendant was ultimately responsible for that crime. But the CVRA includes an express definition of the term "crime victim," and however sympathetic the Court and the Government are to Ms. Rendon's tragedy, she does not fit within that definition. Nor, for the reasons discussed below, is she entitled to relief under any other crime victim statute. Accordingly, Ms. Rendon's motion should be denied.[1]

**STATEMENT OF FACTS**

**A.    The Charges And Extradition**

On July 12, 2004, the Government filed Indictment S3 03 Cr. 1188 (RMB), charging the defendant in two counts. Count One charges that the defendant conspired to (i) import five kilograms and more of cocaine into the United States from a place outside thereof, contrary to Title 21, United States Code, Sections 812, 952(a) and 960(b)(1)(B)(ii), and (ii) distribute five kilograms and more of cocaine, knowing and intending that such substance would be unlawfully imported into the United States, contrary to Title 21, United States Code, Sections 812, 959(a), and 960(b)(1)(B)(ii), all in violation of Title 21, United States

---

[1]    Although not required to do so by law, the Government has offered to confer with Ms. Rendon prior to the defendant's sentencing and to facilitate her participation in the sentencing process, should the Court wish to hear from her pursuant to its discretionary authority under 18 U.S.C. § 3661.

Code, Section 963.  Count Two charges the defendant with
conspiring to launder narcotics proceeds, and aiding and abetting
that offense, contrary to Title 18, United States Code, Section
1956 (a)(1)(B)(i), in violation of Title 18, United States Code,
Sections 2 and 1956(h).

The Indictment also describes the means and methods of
the defendant's conspiracy.  It alleges that the defendant held
the title of "Inspector General" of the AUC, a right-wing
paramilitary organization based in Colombia designated by the
U.S. State Department as a terrorist organization, and which is
"engaged in warfare" with the the left-wing FARC, Colombia's
"main guerilla group."  Indictment ¶ 4(a).  The Indictment
alleges that "[t]o support its terrorist paramilitary activities,
and to enrich its leaders," the AUC was "involved in narcotics
trafficking, and [was] responsible for the importation of multi-
ton quantities of cocaine into the United States." *Id.*  The
Indictment also asserts that the defendant, as the *de facto*
leader of the AUC, directed all of its narcotics-trafficking
activities, the proceeds of which he used to maintain his power
within the AUC.  *Id.* ¶ 4(a).

Aside from general references to the AUC as a
"paramilitary" and "terrorist" organization, the Indictment
includes no allegations that the defendant or his co-conspirators
engaged in acts of violence, let alone acts of violence in

4

furtherance of the conspiracy.  The Indictment does not refer to Ms. Rendon's son, Juan Fernando Vargas Rendon, or to his murder.

On May 27, 2005, Colombian authorities, pursuant to a request for provisional arrest from the United States, arrested the defendant in Colombia.  Thereafter, the United States filed an extradition request with the Colombian Government.  On May 13, 2008, Colombian authorities extradited the defendant, along with 14 other members and leaders of the AUC, to the United States.[2]

On June 17, 2008, the defendant entered a guilty plea to Count One of the Indictment pursuant to a plea agreement containing a stipulated Sentencing Guidelines range of 324 to 405 months' imprisonment.[3]  As part of the plea, the defendant admitted his participation in a conspiracy to distribute and to import five kilograms or more of cocaine.  He did not admit to any acts of violence.  With respect to the issue of restitution, the plea agreement provides that the Court "may order restitution in accordance with Sections 3363 and 3664 of Title 18, United States Code."

---

[2]    The AUC defendants extradited in May 2008 are being prosecuted in different district courts, including in the District of Columbia, the Middle District of Florida, the Southern District of Florida, the Southern District of Texas, and the Southern District of New York.

[3]    Pursuant to the plea agreement, Count Two will be dismissed at sentencing.  Even if Count Two remained as an appropriate frame of reference, however, the analysis and conclusion that Ms. Rendon is not a "crime victim" under the CVRA would be unaffected.

As indicated in its sentencing submission of February 9, 2009, the Government is seeking a sentence of 405 months' imprisonment, the maximum under the plea agreement and Sentencing Guidelines. The defendant is scheduled to be sentenced on March 9, 2009, at 10:00 a.m.

**B.    Requests Under The CVRA Relating To The AUC Defendants**

On July 17, 2008, the Center for Justice & Accountability ("CJA"), joined by the International Human Rights Clinic at Berkeley Law School ("IHRC"), wrote to Kenneth Blanco, then Chief of the Narcotic and Dangerous Drug Section of the Department of Justice ("DOJ"), on behalf of "victims' groups in Colombia" and in connection with the May 2008 extraditions of various AUC leaders. (*See* Rendon Mem., Exh. 27). On the same day, the CJA and IHRC also submitted a letter to the U.S. Attorney's Office for the Southern District of New York relating to the extradition of the defendant, Murillo-Bejarano. Both letters sought to ascertain the steps that DOJ was taking "to implement its obligations under the CVRA in the criminal proceedings" against members of the AUC. (Exh. 27 at 1). Asserting that the AUC defendants both used violence to further their drug trafficking activities and used proceeds from those activities to commit acts of violence, the CJA and IHRC contended

that "[v]ictims of violence perpetrated by the defendants"
qualify as "crime victims" under the CVRA.  (Exh. 27, at 1-2).

Because the CJA's and IHRC's request affected AUC cases
pending in different districts, the DOJ coordinated a single
response to the question of whether the CVRA applies to victims
of violence committed by the AUC in Colombia.  By letter dated
December 19, 2008 ("DAAG Letter"), now Deputy Assistant Attorney
General Kenneth Blanco indicated that, in the DOJ's view, such
individuals did not qualify as "crime victims" as that term is
defined in the statute.  (*See* Exh. 30).  Specifically, the DAAG
Letter explained:

> The CVRA defines a "victim" as "a person
> directly and proximately harmed as a result of
> the commission of a Federal offense or an
> offense in the District of Columbia."  18
> U.S.C. § 3771(e).  That definition does not
> automatically confer victim status on anyone
> who may have been harmed by any and all
> criminal acts of a particular defendant.
> Rather, the definition requires the victim to
> be "directly and proximately harmed" as a
> result of a "Federal offense or an offense in
> the District of Columbia."  United States
> courts that have construed the definition of
> "victim" under the CVRA have looked to the
> offenses at issue in a particular prosecution.
> . . .  The AUC defendants have been charged
> with numerous offenses that relate primarily to
> narcotics trafficking.  The harm sustained by
> the individuals in Colombia, as described in
> your letter, does not directly and proximately
> result from the charged offenses in this case.

(Exh. 30, at 2-3).  The DAAG Letter noted that the DOJ has been
"working closely with Colombian officials to establish a

procedure that will provide Colombian officials with access to
any of the AUC defendants who is participating in the Colombian
Justice and Peace process and willing to make statements as a
defendant or witness to Colombian judicial authorities." (Exh.
30, at 1-2). Consistent with the DAAG Letter, the Government has
advised counsel to defendant Murillo-Bejarano of the Colombian
authorities' interest in continuing to speak with him as part of
the Justice and Peace process, and has offered to facilitate such
a meeting should the defendant choose to participate.[4]

On February 18, 2009, the Government received Ms.
Rendon's motion to be designated a "crime victim" under the CVRA.
Pursuant to the statute, Ms. Rendon seeks (i) to confer with the
Government in connection with the prosecution of this case; (ii)
to be heard by the Court at the defendant's sentencing; and (iii)
restitution. Although not required to do so by law, the day
after receiving Ms. Rendon's motion, the Government contacted her
counsel and offered (i) to meet and confer with Ms. Rendon in
advance of the defendant's sentencing; and (ii) to facilitate her

---

[4]     The Government has made clear to the defendant's
counsel that it has no position on whether the defendant should
respond to the requests of the Colombian authorities. The
Government has stated that, should the defendant choose to
participate in any interviews with Colombian authorities, the
Government (i) would not use any of his statements made in the
interview in connection with the sentencing proceeding in this
matter; and (ii) would not consider his interview as a basis for
varying from any of the stipulations set forth in the plea
agreement, or as cooperation with United States authorities under
either U.S.S.G. § 5K1.1 or 18 U.S.C. § 3553(e).

participation in the sentencing process, pursuant to the Court's discretion under 18 U.S.C. § 3661.

**ARGUMENT**

**A.   Applicable Law**

The CVRA, enacted in 2004, provides "crime victims" with an expansive set of rights in the criminal process.  18 U.S.C. § 3771.  Among other things, the statute provides the right (1) to be reasonably protected from the accused; (2) to notice of public proceedings involving the accused; (3) not to be excluded from such public proceedings; (4) to be heard at any proceedings involving release, plea, sentencing, or parole; (5) to confer with the prosecutors; (6) to full and timely restitution; (7) to proceedings without unreasonable delay; and (8) to be treated with fairness, dignity, and respect for privacy.  18 U.S.C. § 3771(a)(1)-(8).  "In any court proceeding involving an offense against a crime victim, the court shall ensure that the crime victim is afforded" these rights.  18 U.S.C. § 3771(b); *see In re W.R. Huff Asset Management Co., LLC*, 409 F.3d 555, 561 (2d Cir. 2005); *see also Kenna* v. *U.S. Dist. Court for C.D.Cal.*, 435 F.3d 1011, 1013 (9th Cir. 2006) (noting that the CVRA "allows both the government and the victims to enforce" the rights set forth therein).

9

The CVRA extends these rights only to people who qualify as "crime victims." A "crime victim" is defined by the statute, in turn, as "a person directly and proximately harmed as a result of the commission of a Federal offense." 18 U.S.C. § 3771(e).[5] To determine whether a person is a crime victim, therefore, one must first "identify the behavior constituting 'commission of a Federal offense.'" *United States* v. *Stewart*, 552 F.3d 1285, 1288 (11th Cir. 2008). Then, one must "identify the direct and proximate effects of that behavior on parties other than the United States. If the criminal behavior causes a party direct and proximate harmful effects, the party is a victim under the CVRA." *Id.*

In conducting this analysis, courts have generally limited their inquiry to "conduct underlying an element of the offense." *United States v. Sharp*, 463 F. Supp. 2d 556, 563 (E.D. Va. 2006) (internal quotation marks and citation omitted); *see also Stewart*, 552 F.3d at 1288. *But see United States* v. *Turner*, 367 F. Supp. 2d 319, 326 (E.D.N.Y. 2005) (stating, in dictum, that "[w]hile the offense charged against a defendant can serve as a basis for identifying a 'crime victim,' . . . the class of

_____

[5] The statute also provides, in relevant part, that where a "crime victim" is deceased, "the legal guardians of the crime victim or the representatives of the crime victim's estate, family members, or any other persons appointed as suitable by the court, may assume the crime victim's rights." *Id.* As a result, whether Ms. Rendon herself qualifies as a "crime victim" turns on whether her son was a "crime victim" under the CVRA.

victims with statutory rights may well be broader"). That
limitation flows from the language of the CVRA itself, because
the statute speaks of the commission of "a Federal offense." As
the Supreme Court explained in interpreting similar language in
an earlier version of a related statute, "Had Congress intended
to permit a victim to recover for losses stemming from all
conduct attributable to the defendant, including conduct related
to the offense of conviction, Congress would likely have chosen
language other than 'the offense,' which refers without question
to the offense of conviction." *Hughey* v. *United States*, 495 U.S.
411, 418 (1990).

Comparison of the CVRA's language with the
substantially broader language of two related statutes, the
Mandatory Victim Restitution Act ("MVRA"), 18 U.S.C. § 3663A, and
the Victim Witness Protection Act ("VWPA"), 18 U.S.C. § 3663, is
also instructive. Under the VWPA and the MVRA, a "victim" is
defined as follows:

> a person directly and proximately harmed as a
> result of the commission of an offense for
> which restitution may be ordered including, *in
> the case of an offense that involves as an
> element a scheme, conspiracy, or pattern of
> criminal activity, any person directly harmed
> by the defendant's criminal conduct in the
> course of the scheme, conspiracy, or pattern.*

18 U.S.C. § 3663(a)(2) (VWPA) (emphasis added); *accord id.*
§ 3663A(a)(2) (MVRA). In the case of "an offense that involves

as an element a scheme, conspiracy, or pattern of criminal activity,*"* therefore, the definition of "victim" under the VWPA and the MVRA is substantially broader, extending to any person "directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern."

Significantly, Congress added this language to the VWPA in response to the Supreme Court's decision, referenced above, in *Hughey*, in which the Court had limited restitution under the VWPA to "the loss caused by the specific conduct that is the basis of the offense of conviction." 495 U.S. at 413. *See generally United States* v. *Boyd*, 222 F.3d 47, 50 (2d Cir. 2000) (noting that Congress "broadened the scope of restitution from losses attributable solely to the offense of conviction to all losses caused in the course of a defendant's criminal conduct, whether the defendant is convicted of each of those offenses or not"); *United States v. Kones*, 77 F.3d 66, 70 (3d Cir. 1996) (similar). Congress, however, excluded this language from the CVRA. Instead, as with the pre-*Hughey* version of the VWPA, it tethered the statute to the commission of a federal "offense." As such, it can and should be inferred that Congress intended to limit inquiry to the specific conduct that is the basis of the offense. *See, e.g.*, *United States v. Hunter*, No. 2:07CR307DAK, 2008 WL 53125, at *2 (D. Utah Jan. 3, 2008) ("Congress passed the CVRA knowing that the Supreme Court has interpreted similar language

in prior victims' rights acts not to refer to uncharged conduct."); *Sharp*, 463 F. Supp. 2d at 561 & n.11 (same); *Turner*, 367 F. Supp. 2d at 326-27 (same). *See generally Seibert v. Conservative Party of New York State*, 724 F.2d 334, 337 (2d Cir. 1983) ("Congress is presumed to be aware of the judicial background against which it legislates.").

Finally, limiting the inquiry into who qualifies as a "crime victim" to the conduct underlying the elements of a particular offense makes sense. The rights of a crime victim under the CVRA are triggered very early in the criminal process –- as early as the initial presentment on a complaint, perhaps even earlier. *See, e.g.*, 18 U.S.C. § 3771(a)(1) (right to notice of any proceeding involving release of the accused); *see also, e.g., In re Dean*, 527 F.3d 391, 394 (5th Cir. 2008) ("[T]he government should have fashioned a reasonable way to inform the victims of the likelihood of criminal charges and to ascertain the victims' views on the possible details of a plea bargain."). If any victim of a defendant's related criminal conduct qualified as a "crime victim," the Government and the Court (which has an independent obligation to ensure that a crime victim is afforded his or her rights under the statute, *see* 18 U.S.C. § 3771(b)(1)) may be forced to determine the full scope of the defendant's related criminal conduct in order to give effect to the statute. In many cases where the precise scope of the defendant's overall

conduct is unclear, that might necessitate far-flung and time-consuming investigation and litigation.  Courts would, in essence, be required to hold mini-trials merely to determine the full scope of a particular defendant's criminal conduct and who qualified as a crime victim.  And where the Government's charges were part of a broader, ongoing investigation, such an inquiry could potentially jeopardize the ongoing investigation.  If Congress had intended to expand the traditional criminal proceedings in that manner – particularly where, as here, there are a variety of civil remedies potentially available to victims, including the Alien Tort Claims Act and the Colombian Justice and Peace process – it surely would have said so clearly.

**B.    Discussion**

> **1.    Ms. Rendon Does Not Qualify As A Victim Of The Charged Offense Under The CVRA**

In light of the foregoing, and notwithstanding the terrible loss that Ms. Rendon suffered, it cannot be said that she is a "crime victim" of the defendant's narcotics conspiracy as that term is used in the CVRA.  As set forth above, a person qualifies as a "crime victim" under the statute only where he or she was "directly and proximately harmed" by "conduct underlying an element of the offense."  *Sharp*, 463 F. Supp. 2d at 563. Here, the defendant's offense is a narcotics conspiracy, which has two elements: (i) an agreement between two or more persons,

the objects of which were (a) to import at least five kilograms of cocaine into the United States, and (b) to distribute at least five kilograms of cocaine while knowing or intending that they would be imported into the United States; and (ii) the defendant knowingly joined the conspiracy. The defendant's conduct underlying these two elements does not include violence or force. Nor was he charged with or did he admit in this Court to any acts of violence, let alone the murder of Mr. Vargas. Accordingly, Mr. Vargas's murder was not proximately and directly caused by the defendant's offense within the meaning of the CVRA. *Cf. Sharp*, 463 F. Supp. 2d at 564 (holding that the victim of an assault by the customer of the defendant drug dealer did not qualify as a "crime victim" of the defendant's drug conspiracy because the "specific conduct underlying the elements" of a drug conspiracy do "not include assault and battery, or any other violence conduct").

Relying on *United States* v. *Brock-Davis*, 504 F.3d 991 (9th Cir. 1997), and *United States* v. *Boyd*, 222 F.3d 47, 50-51 (2d Cir. 2000), Ms. Rendon contends that the CVRA covers "those harmed by the actions of a defendant's co-conspirators, regardless of the facts underlying the counts of the defendant's own individual prosecution," as well as those "harmed by a crime for which a defendant has not been charged or has been acquitted." (Rendon Mem. 9-10). But those cases involved the

15

substantially broader language of the MVRA, not the CVRA, which uses an offense-based definition of a "crime victim" much like the pre-amendment definition in the VWPA that was at issue in *Hughey*. As with the pre-amendment VWPA, "had Congress intended" for the CVRA "to permit a victim to recover for losses stemming from all conduct attributable to the defendant, including conduct unrelated to the offense of conviction, Congress would likely have chosen language other than 'the offense,' which refers without question to the offense of conviction." *Hughey*, 495 U.S. at 418.

Ms. Rendon also invokes a statement by Senator Kyl in floor debate on the CVRA that the statute includes "an intentionally broad definition because all victims of crime deserve to have their rights protected, whether or not they are the victim of the count charged." (Rendon Mem. 8-9 (citing 150 Cong. Rec. S. 10910, 10912 (daily ed. Oct. 9, 2004)). A solitary statement by one legislator, even the sponsor of legislation, is not sufficient, however, to disregard the plain language of a statute. *See, e.g., Lee v. Bankers Trust Co.*, 166 F.3d 540, 544 (2d Cir.1999) ("It is axiomatic that the plain meaning of a statute controls its interpretation, and that judicial review must end at the statute's unambiguous terms. Legislative history and other tools of interpretation may be relied upon only if the terms of the statute are ambiguous.") (citations omitted);

*Chrysler Corp.* v. *Brown*, 441 U.S. 281, 311 (1979) ("The remarks of a single legislator, even the sponsor, are not controlling in analyzing legislative history."). Here, as several courts have recognized, the actual language of the CVRA is nowhere near as expansive as Senator Kyl's statement might suggest. *See, e.g.*, *Hunter*, 2008 WL 53125, at *2; *Sharp*, 463 F. Supp. 2d at 561 & n.11; *Turner*, 367 F. Supp. 2d at 326-27.

Indeed, if Ms. Rendon's construction of the statute were correct, the implications for this case and others would be potentially staggering. According to the CJA and IHRC, approximately 13,000 "individuals have registered with Colombia's Office of the Attorney General as victims of armed groups controlled by Murillo-Bejarano." (July 17, 2008 Letter). If, as Ms. Rendon contends, the CVRA applied to "those persons harmed by any acts of related conduct for which the defendant was not convicted" (Rendon Mem. 10), the Court and the Government may have to engage in a far-flung investigation to determine which of those 13,000 people (and perhaps others) had actually been harmed by the defendant's conduct. The Court would then be required to determine whether that harm was "related" to the defendant's offense conduct. In many cases involving defendants who belonged to large criminal organizations or enterprises, including this one, that inquiry alone would lead to extensive collateral litigation. All of that would have to be completed before the

defendant could actually be held accountable for his crimes of conviction. Given the potential availability of civil remedies for the victims of criminal acts, there is no need to expand the criminal process so dramatically in this manner.

Even if the Court were to look beyond the conduct underlying the elements of the defendant's offense of conviction, Ms. Rendon's factual allegations do not establish direct and proximate cause. Ms. Rendon's motion is premised on an assertion that her son's murder must have been (i) committed in furtherance of the AUC's drug trafficking activities (*see* Rendon Mem. 10); or (ii) financed by the AUC's drug trafficking activities. (*Id.*). But the evidence adduced by Ms. Rendon also shows that the AUC's violence was often motivated by other considerations unrelated to the narcotics business. Much of the violence afflicting Medellin, and Comuna 13 (where Mr. Vargas was murdered) in particular, has arisen from the AUC's political conflict with the FARC. *See, e.g.*, Rendon Mem. Exh. 10, at 3 ("As the war between the FARC and the paramilitaries . . . escalates and forces people out of the countryside, Medellin is filling up with more displaced people than it can possibly house."); *id.* Exh. 12, at 1 (stating that the "Order we had from the high command" of the AUC in Comuna 13 "was to do away with the FARC MILITIAS. . ."); *id.* Exh. 14 at 1 ("Colombia's internal armed conflict has pitted the security forces and army-backed paramilitaries against guerrilla

groups in a struggle for territory and economic resources."); *id.* Exh. 33, at 2 ("The AUC exercised increased influence during the year and fought to extend its presence through violence and intimidation into areas previously under guerrilla control while conducting selective killings of civilians whom it alleged collaborated with guerrillas.").

Apart from violence relating to its combat with the FARC, the AUC also committed atrocities for other purposes, including (i) the targeting of individuals believed to be cooperating with authorities, *see* Exh. 12 at 4 (describing a murder in Comuna 13 of "folks for being snitches"); Exh. 17 at 2 (explaining that disappearances occurred in Comuna 13 of "snitches" and "others because of being militia guys"); (ii) kidnaping and extortion for "arms/weapons" (Exh. 12 at 9); (iii) kidnaping for political purposes (Exh. 32, at 9) (describing kidnapings of members of Congress as a way to demand consultation in the peace process); (iv) "cleansing" of "individuals deemed socially undesirable" (Exh. 33, at 8); (v) the enforcement of "social controls" (Exh. 33, at 11) (describing AUC kidnapings designed to punish domestic violence); and (vi) religious reasons (Exh. 33, at 20 ("The AUC sometimes targeted representatives and members of the Roman Catholic Church and evangelical Christian churches, generally for political reasons.").

Ms. Rendon contends that, because Comuna 13 was a "strategic corridor" for the AUC's drug trafficking efforts, its violence in that area (including the murder of Mr. Vargas) must have promoted its narcotics-related activities. (Rendon Mem. 11-12). But the evidence proffered by Ms. Rendon shows that Comuna 13 was a "strategic corridor" not just for drug trafficking, but for other reasons as well. Medellin, where Comuna 13 is located, housed a diverse "industry of crime – cocaine processing, distribution, transport, and sales, car and motorcycle theft, arms dealing, jewel theft, money laundering, contract killing, kidnaping." (Exh. 10, at 5). Comuna 13 was a "strategic corridor" not just for narcotics, but also for the "theft of hydrocarbons" from the gas "pipeline." (Exh. 11, at 3).

Nor does the record support Ms. Rendon's assertion that Mr. Vargas's murder must have been caused by proceeds resulting from the defendant's narcotics conspiracy. As a former member of the AUC testified, the *Cacique Nutibara Bloc* in Comuna 13 –– which is the AUC bloc that Ms. Rendon alleges killed her son –– was financed not just from drugs, but also from "the secret gasoline valves, the vaccines . . . , the big businesses, [and] the rich people." (Exh. 12, at 11); *see also* Exh. 32, at 15 ("AUC leader Carlos Castano admitted publicly that his group receives funding from both legitimate businesses and from

narcotics trafficking, and that the group is financed by 'dominant business' in the regions in which it operates.").

If Ms. Rendon's construction of the CVRA were correct, the Court would be required to wade into this factual thicket, not only to confirm that Mr. Vargas was murdered by the AUC, but also to determine if the murder was related to the AUC's drug-trafficking activities as opposed to its other illegal activities. Moreover, the Court may have to conduct such inquiries with regard to similarly situated claimants, of which there may be, by the IHRC's count, more than 13,000. This would derail these criminal proceedings and would delay indefinitely the Government's efforts to finally bring Murillo-Bejarano to justice at sentencing. Congress surely did not intend for that kind of collateral litigation in a criminal proceeding, particularly where, as here, a victim has a variety of potential civil remedies available.

### 2. Ms. Rendon Is Not Entitled To Restitution Under The MVRA

Ms. Rendon also contends in passing that she is entitled to restitution under the MVRA. (Rendon Mem. 15-16). The MVRA requires restitution when sentencing a defendant convicted or, or when there has been a plea agreement relating to, any offense that is (i) a crime of violence, as defined in section 16; (ii) an offense against property under this title, or under section 416(a) of the Controlled Substances Act . . .,

including any offense committed by fraud or deceit; or (iii) an offense described in section 1365 (relating to tampering with consumer products)."  18 U.S.C. § 3663A(c)(1)(A)(i)-(iii).  Ms. Rendon relies on the "crime of violence" provision, asserting that the defendant used "violence to further [his] drug business, and vice versa."  (Rendon Mem. 15).

The "crime of violence" provision of the MVRA, however, does not apply to the defendant's offense of conviction.  A "crime of violence" is: "(a) an offense that has an element the use, attempted use, or threatened use of physical force against the person or property of another; or (b) any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense."  18 U.S.C. § 16.  Because the defendant's narcotics offense does not have as an element the use of force, Ms. Rendon relies on Section 16(b), asserting that there is "an obvious nexus between violence and drug crimes."  (Rendon Mem. 15).  But "[t]he language 'by its nature'" in Section 16(b) "requires an inquiry into the intrinsic nature of the crime, not into the facts of the offense as it was committed in the particular case."  *United States* v. *Bonetti*, 277 F.3d 441, 452 (4th Cir. 2002).

The "intrinsic nature" of a drug conspiracy, the offense at issue here, does not involve a "substantial risk of

22

physical force." 18 U.S.C. § 16(b). As the Second Circuit has observed, "While the traffic in drugs is often accompanied by violence, it does not by its nature involve substantial risk that physical violence will be used. . . . Such transactions are often wholly consensual, and do not necessarily present threats of physical harm to any person or property." *United States* v. *Diaz*, 778 F.2d 86, 88 (2d Cir. 1985); *see also United States* v. *Baker*, 10 F.3d 1374, 1394 (9th Cir. 1993) ("a conspiracy to manufacture, distribute, or possess a controlled substance does not 'by its nature' involve a substantial risk of physical force").[6] Accordingly, the MVRA does not apply to the defendant's conviction on the charge of a narcotics conspiracy.

### 3. Ms. Rendon Is Not Entitled To Restitution Under The VWPA

Finally, Ms. Rendon suggests, in a footnote, that she "could also be awarded restitution under the VWPA." (Rendon Mem. 15 n.50). Ms. Rendon relies on language from the plea agreement, which states that the Court "may order restitution in accordance with Sections 3363 and 3664 of Title 18, United States Code."

---

[6] In *United States* v. *Myers*, 280 F.3d 407 (4th Cir. 2002), upon which Ms. Rendon relies, the court found that the defendant's use of a firearm in furtherance of his drug offense, in violation of 18 U.S.C. § 924(c), presented a substantial risk of physical force, warranting restitution under the MVRA. Section 924(c), however, intrinsically involves a substantial risk of force, as it requires the use or possession of a firearm. A narcotics conspiracy, without a Section 924(c) offense, is considerably different.

(*Id.*).  A court's authority to order restitution under the VWPA
is discretionary, however.  Moreover, the statute "does not
authorize a district court to order restitution to all
individuals harmed by a defendant's criminal conduct."  *United
States* v. *Blake*, 81 F.3d 498, 506 (4th Cir. 1996).  "For a person
to be considered a victim under § 3663, the act that harms the
individual must be either conduct underlying an element of the
offense of conviction, or an act taken in furtherance of a
scheme, conspiracy, or pattern of criminal activity that is
specifically included as an element of the offense of
conviction."  *Id.* (citing *United States* v. *Obasohan*, 73 F.3d 309,
311 (11th Cir. 1996)).[7]  As set forth above, notwithstanding her
allegations that the AUC's violence was often in furtherance of,
and financed by, drug trafficking, Ms. Rendon has not shown that
Mr. Vargas's murder in particular was in furtherance of the
narcotics conspiracy to which Murillo-Bejarano pled guilty.  The

---

[7]     In *Boyd*, the Second Circuit stated that the amended
version of the VWPA "broadened the scope of restitution from
losses attributable solely to the offense of conviction to all
losses caused in the course of a defendant's criminal conduct,
whether the defendant is convicted of each of those offenses or
not."  222 F.3d at 50.  Although the defendant in *Boyd* was
acquitted of the conspiracy offense, the Court nevertheless
authorized restitution relating to the conspiracy, as the jury
had necessarily found (based on a *Pinkerton* theory) that the
defendant's offense "was committed pursuant to the common plan of
the conspiracy."  *Id.*, 222 F.3d at 51.  Therefore, *Boyd* does not
undermine the proposition that, in the context of the VWPA or
MVRA, a victim's harm arising from a conspiracy offense must
result from conduct undertaken in furtherance of that conspiracy.

evidence adduced by Ms. Rendon, therefore, does not provide a basis for restitution under the VWPA.

*     *     *     *     *

Ms. Rendon's son was undeniably the victim of a horrible crime and, as Ms. Rendon's evidence would appear to indicate, the defendant in this case may well be responsible for the crime. The Government is ever cognizant of the harm done by narco-terrorism worldwide, and circumstances like Ms. Rendon's are a large part of why the Government targets defendants like Murillo-Bejarano and makes extraordinary efforts to bring them to justice. Nevertheless, Ms. Rendon does not qualify as a "crime victim" of the defendant's offense under the technical legal definition of that term in the CVRA. Nor is she entitled to relief as a victim under the VWPA or MVRA.

Although not required to do so by law, the Government nonetheless has offered to confer with Ms. Rendon and to facilitate her participation in the sentencing process, should the Court choose to hear from her in its discretion. *See* 18 U.S.C. § 3661 ("No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence.").

25

## CONCLUSION

For the foregoing reasons, Ms. Rendon's motion pursuant to the Crime Victim Rights Act should be denied.

Dated:  New York, New York
        February 27, 2009

                              Respectfully submitted,

                              LEV L. DASSIN
                              Acting United States Attorney


                    By:  /s/ Eric Snyder_____
                         Anirudh Bansal/Eric Snyder/Anjan
                         Sahni/Jesse M. Furman
                         Assistant United States Attorneys
                         Telephone: (212) 637-2516/2536/
                              2491/2475

<u>CERTIFICATE OF SERVICE</u>

Eric Snyder deposes and says that he is employed in the Office of the United States Attorney for the Southern District of New York.

That on February 27, 2009, he served a copy of the foregoing Government's Memorandum of Law in Opposition to Ms. Rendon's Motion Pursuant To The CVRA on the following counsel, by ECF and electronic mail, on:

Margaret Shalley, Esq.
Leo Cunningham, Esq.
Lee-Ann Mulholland, Esq.
Roxanna Altholz, Esq.
Joshua Plaut, Esq.

I declare under penalty of perjury that the foregoing is true and correct. 28 U.S.C. Section 1746.


        /s/ Eric Snyder


Executed on: February 27, 2007
             New York, New York